UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CECILIA NICHOLAS,

                         Plaintiff,

         v.                                      10-CV-1565

CITY OF BINGHAMTON, NEW YORK, and
Binghamton Police Officers CHARLES HARDER,
JAMES MOONEY, Capt. JOHN CHAPMAN, and
Chief JOSEPH ZIKUSKI.

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiff Cecilia Nicholas commenced the instant action against the City of

Binghamton and Binghamton Police Officers Charles Harder, James Mooney, Captain John

Chapman, and Chief Joseph Zikuski (collectively "Defendants") pursuant to 42 U.S.C. §

1983.  Presently before the Court is Defendants' Motion for Summary Judgment pursuant to

Fed. R. Civ. P. 56 seeking dismissal of Plaintiff's Second Amended Complaint in its entirety.

Dkt. Nos. 30, 32.

## I.      FACTS

On September 29, 2009, around 11:30AM, Plaintiff was in her home on Lathrop

Avenue in Binghamton, New York.  She was sitting near a gas fireplace when suddenly the

flame went out.  Dkt. No. 32 at 7.  When Plaintiff saw the flame go out, she jumped up and

went to the rear door of her house.  Id.  She saw that a New York State Electric and Gas

("NYSEG")[1] vehicle was parked in front of her house.  Id.  She then opened the door and observed a NYSEG employee in her driveway, getting close to the sidewalk.  Id. at 8; Dkt. No. 46 at 2.  The NYSEG employee had shut off Plaintiff's gas for failure to pay her bill.  Dkt. No. 32 at 8; Dkt. No. 46 at 2.  The NYSEG employee turned around when Plaintiff opened the door and Plaintiff asked him to turn the gas back on.  Dkt. No. 32 at 8; Dkt. No. 46 at 2.  The NYSEG employee told her he could not and that another crew was responsible for turning gas services on.  Dkt. No. 32 at 8; Dkt. No. 46 at 2.  Plaintiff knew this to be true because her gas had been shut off three weeks prior to this incident.  Dkt. No. 32 at 8; Dkt. No. 46 at 2.  Plaintiff then asked the NYSEG employee not to leave; she told him to either call someone to turn the gas on or call the police.  Dkt. No. 32 at 8; Dkt. No. 46 at 2. The NYSEG employee complied and called the police.  Dkt. No. 32 at 8; Dkt. No. 46 at 2.  Plaintiff did not believe the shut off was valid; she alleges she paid $800 to NYSEG three weeks prior.  Dkt. No. 32 at 8; Dkt. No. 46 at 2.

Thereafter, the NYSEG employee got back into his vehicle (which was running) – either a truck or SUV – and waited for the police to arrive.  Dkt. No. 32 at 8; Dkt. No. 46 at 2. Plaintiff also waited in the vicinity of the NYSEG vehicle.  Dkt. No. 32 at 9; Dkt. No. 46 at 2. After standing beside the truck for awhile, Plaintiff tapped on the driver's side window of the NYSEG vehicle.  Dkt. No. 32 at 9; Dkt. No. 46 at 2.  She asked the NYSEG employee if he had called the Police and he shook his head indicating he had.  Dkt. No. 32 at 9; Dkt. No. 46 at 2.

---

[1]NYSEG is a gas and electric provider for parts of New York.

Plaintiff estimated she stood in front of, near, or alongside the NYSEG vehicle for at least 20 minutes.  Dkt. No. 32 at 9; Dkt. No. 46 at 2.  During her wait, Plaintiff became cold and she decided to lean on the vehicle for warmth.  Dkt. No. 32 at 9; Dkt. No. 46 at 3.  Eventually, she climbed up onto the hood of the vehicle to keep warm.  Dkt. No. 32 at 9; Dkt. No. 46 at 3.  Plaintiff grabbed the backside of the vehicle's hood, near the windshield wipers, and pulled herself onto the hood without stepping on the bumper.  Plaintiff's feet were dangling off the hood; the only way she could have touched the ground was if she had slid down off the NYSEG vehicle.  Dkt. No. 32 at 9; Dkt. No. 46 at 3.

Eventually, Officer Harder arrived on the scene.  Dkt. No. 32 at 9; Dkt. No. 46 at 3.  At this time, Plaintiff was laying on the hood of the NYSEG vehicle.  Dkt. No. 32 at 9; Dkt. No. 46 at 3.  Officer Harder parked his vehicle parallel to the NYSEG vehicle.  Dkt. No. 32 at 9; Dkt. No. 46 at 3.  In his police report, Officer Harder stated that he: "[r]esponded to a complaint of a woman standing in front of a NYSEG truck and refusing to let it leave."  Dkt. No. 30, Ex. B at 1.  Upon his arrival, he "observed Plaintiff lying on the hood of the NYSEG truck with the worker inside."  Id.

Plaintiff alleges that Officer Harder, without first asking any questions, grabbed Plaintiff by the rear waistband of her pants and by one of her arms and "yanked" her off the NYSEG vehicle.  Dkt. No. 32 at 10; Dkt. No. 46 at 3.  She argues that he dragged and shook her across the lawn toward the front stoop, and that she asked him to stop because he was hurting her and she had Multiple Sclerosis.  Dkt. No. 39 at 3.  During this time, she alleges Officer Harder was trying to trip her and was deliberately keeping her off balance.  Dkt. No. 46 at 3.  Before arriving at her front stoop, Officer Harder let her go.  Dkt. No. 32 at 10.

Plaintiff argues she stumbled onto the steps of her front stoop.  Dkt. No. 46 at 3.

After sitting on the steps, she asked Officer Harder what his name was.  Dkt. No. 39. at 3.

Officer Harder stated his name and thereafter told her she was out of control and she would

be taken to Binghamton General Hospital's CPEP Unit (Comprehensive Psychiatric

Emergency Program Unit) for evaluation.  Dkt. No. 32 at 11; Dkt. No. 46 at 4.  While Plaintiff

was sitting on the stoop, she realized another officer, Officer Mooney, had arrived.  Dkt. No.

32 at 11; Dkt. No. 46 at 4.

After being told she was going to CPEP, Plaintiff asked if she could first tend to her

dog, brush her hair and teeth, use the bathroom, take her medication, and lock up her house.

Dkt. No. 39 at ¶ 23.  The officers allowed her to do so.  Id. at ¶ 39.  After letting her dog out,

Plaintiff entered the house with her dog at her side, and the officers entered into her home

right behind her.  Id.; Dkt. No. 30, Ex. A 103:7-8.  The officers remained only where Plaintiff

was physically present.  Dkt. No. 30, Ex. A 103:1-3.

After being allowed to perform various tasks in her home, Plaintiff then asked if she

could give her dog his medication and requested she be accompanied by her dog to the

hospital because he was a service dog.  Dkt. No. 30, Ex. A at 105-106.  The officers refused

and allegedly became agitated.  Id.  Thereafter, they assisted Plaintiff to the ground,

"practically kneeling" on her and, when her back was on the floor of her bathroom, they

handcuffed her.  Id. at 106:6-8.  The handcuffs were placed on the front of her body.  Id.  After

being handcuffed, Plaintiff alleges she was dragged down her driveway to the front steps of

her home.  Dkt. No. 39 at ¶ 41.  Plaintiff complained the handcuffs were too tight.  Dkt. No.

30, Ex. A at 108:22-23.  In response to her complaint, Officer Harder placed his two fingers

between the cuffs and the underside of her wrists, yanked the handcuffs, and told her "they're fine."  Id.

After being handcuffed, Officer Mooney called an ambulance.  Dkt. No. 30, Ex. B at 6.  In his police report, Officer Mooney indicated he called the ambulance because Plaintiff complained of chest pains.  Id.  Plaintiff states that she did not have chest pains, but when Officer Mooney asked if she needed an ambulance she stated that was a good idea because she does have a heart condition.  Dkt. No. 30, Ex. A: 106-107.  When Plaintiff reached the front stoop, she sat down next to Officer Mooney, who removed her handcuffs.  Id.  The ambulance report indicates Plaintiff was handcuffed for about four minutes.  Dkt. No. 30, Ex. C.

When the ambulance arrived, Officer Harder stated Plaintiff was going to "behavioral" at General Hospital.  Dkt. No. 39 at ¶¶ 121-22.  While at the hospital, Plaintiff did not see Officer Mooney.  Dkt. No. 30, Ex. A 124:11-13.  However, she did see Officer Harder because she heard him tell the hospital staff that she was "here for behavioral."  Dkt. No. 39 at ¶¶ 121-22.  Plaintiff's person and purse were searched at the hospital.  Id. at ¶ 48.  Thereafter, Plaintiff was interviewed by CPEP personnel, who determined Plaintiff was not in need of psychiatric services.  Id. at ¶ 49.  Around 6:30 pm, Plaintiff was released from the hospital.  Dkt. No. 30, Ex. A. 133-35.

On December 27, 2010, Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 and the issue was joined when both the Defendant City and Defendant officers filed Answers.  Dkt. Nos. 7, 8.  On July 2, 2011, Plaintiff filed an Amended Complaint asserting seventeen causes of action: eight federal claims and nine state law claims.  Dkt. No. 14.  Plaintiffs federal Constitutional claims are that her Fourth Amendment right to be free from

unreasonable searches and seizures was violated when she was falsely arrested, illegally

searched, subjected to excessive force, and when her home was warrantlessly invaded; and

that her First Amendment right to free speech was violated.  She also asserts a <u>Monell</u> claim

against the City of Binghamton, a supervisory liability claim, and a Title II claim under the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §12132.  Dkt. No. 39 at ¶¶ 71-06.  Her

state law claims are intentional infliction of emotional distress ("IIED"); battery; abuse of

process; defamation; violation of New York Civil Rights Law Article 2 §8; violation of New York

Civil Rights Law Article 4b § 47(b); violation of New York Executive Law Article 15 § 296(14);

violation of the New York Constitution Article 1 §§ 8, 11, 12; trespass; and respondeat

superior.  <u>Id.</u> at ¶¶ 107-41.  On May 18, 2012 Plaintiff filed a Second Amended Complaint,

adding no new claims, but rather adding a request for equitable relief under New York's Clear

Your Good Name Act if she prevails on her claim that her detention pursuant to the Mental

Hygiene Law was unfounded.  Dkt. No. 39.

> Presently before the Court is Defendants' Motion for Summary Judgment pursuant

to Fed. R. Civ. P. 56 seeking dismissal of Plaintiff's Second Amended Complaint in its

entirety.  Dkt. Nos. 30, 32.  Plaintiff opposes the motion.  Dkt. No. 46.  Defendants have

submitted a reply.  Dkt. Nos. 48, 50.

## II.        STANDARD OF REVIEW

> The Court may grant summary judgment where "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A dispute is genuine if the relevant evidence is such that a reasonable jury could return

a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).  A

party seeking summary judgment bears the burden of informing the court of the basis for the

motion and must identify those portions of the record that the moving party believes

demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477

U.S. 317, 323, 106 S. Ct. 2548 , 2553 (1986).  The court must view the inferences to be

drawn from the facts in the light most favorable to the party opposing the motion.  Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538

(1986).

　　　　If the movant is able to establish a prima facie basis for summary judgment, the

burden of production shifts to the party opposing summary judgment.  Id. at 587.  The

nonmoving party must produce evidence establishing the existence of a factual dispute that a

reasonable jury could resolve in her favor.  Id.  The nonmoving party must show, by affidavits

or other evidence, that there are specific factual issues that can only be resolved at trial.  See

Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).  However, the nonmoving party cannot

defeat summary judgment by "simply show [ing] that there is some metaphysical doubt as to

the material facts,"  Matsushita Elec., 475 U.S. at 586, or by a factual argument based on

"conjecture or surmise." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  In this regard, a

party opposing a properly supported motion for summary judgment may not rest upon "mere

allegations or denials" asserted in the pleadings, or on conclusory allegations or

unsubstantiated speculation.  See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998);

Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525–26 (2d Cir. 1994).

　　　　With these standards in mind, the Court will address the pending motions.

III.　　DISCUSSION

　　　a.　　**Plaintiff's Federal Claims**

Defendants move for summary judgment against all of Plaintiff's Federal claims.

### 1.   <u>False Arrest</u>

First, Defendants move to dismiss Plaintiff's false arrest claim.  Dkt. No. 30 at 250;

Dkt. No. 32 at 27.  Plaintiff asserts this claim pursuant to 42 U.S.C. § 1983 against

Defendants Harder, Mooney, Chapman, and Zikuski.  Dkt. No. 39 at ¶ 80.  Defendants seek

dismissal of this claim on the grounds that Officers Harder and Mooney had probable cause to

seize Plaintiff pursuant to § 9.41 of the New York Mental Hygiene Law and to arrest Plaintiff

for engaging in disorderly conduct, in violation of New York Penal Law § 240.20.  Dkt. No. 30

at 250-51, Dkt. No. 32 at 6-7.  Plaintiff responds by stating that Defendants have offered

insufficient evidence demonstrating the absence of a triable issue of material fact.  Dkt. No.

46 at 1.  She argues that the police incident report is inadmissable evidence.  <u>Id.</u>  She further

argues that the only admissible evidence offered was that she was leaning on the parked

vehicle and that this act alone is insufficient to establish probable cause.  <u>Id.</u> at 2.

### a. <u>Whether Probable Cause Existed to Seize Plaintiff under MHL § 9.41</u>

The existence of probable cause to arrest is a complete defense to a claim of false

arrest.  <u>See</u> <u>Jaegly v. Couch</u>, 439 F.3d 149, 152 (2d Cir. 2006).  Probable cause in the mental

health seizure context requires only a probability or substantial chance of dangerous behavior,

not an actual showing of such behavior.  <u>Burdick v. Johnson</u>, 2009 WL 1707475, at *6

(N.D.N.Y. June 17, 2009) (citing <u>Hoffman v. County of Delaware</u>, 41 F. Supp. 2d 195, 209

(N.D.N.Y. 1999)).  The relevant probable cause inquiry converges on whether the facts and

circumstances known to the officers at the time they seized Plaintiff were sufficient to warrant

a person of reasonable caution to believe that she might be mentally ill and conducting herself

in a manner likely to result in serious harm to herself.  <u>Id.</u>  "Whether a person seized pursuant

to the MHL is later found to be mentally competent and released is irrelevant to the probable cause analysis." Id.

Here, Defendants had probable cause to seize Plaintiff pursuant to § 9.41 of the Mental Hygiene Law.  After Plaintiff told the NYSEG employee to call the police and instructed him not to leave, the employee returned to his idling vehicle and sat in the driver's seat.  Dkt No. 30, Ex. A 42:7-14; 44:15-18.  Thereafter, Plaintiff remained close to the vehicle; she estimated she stood near, or alongside, or in front of the NYSEG vehicle for at least 20 minutes.  Id. at 49:8-10.  Her Complaint alleges that, while waiting for the police, she became chilled so she climbed onto the hood of the vehicle to lean on it for warmth.  Id. at 54:3-6; Dkt. No. 39 at ¶12.  Her deposition testimony indicates she grabbed the backside of the hood, near the windshield wipers, and pulled herself onto the hood without stepping on the bumper.  Dkt. No. 30, Ex. A. 58:1-4.  Her feet were dangling off the hood; the only way she could have touched the ground was if she had slid down the vehicle.  Id.  During this time, the vehicle was running and the NYSEG employee remained in the driver's seat.  Id. at  53:5-6; 54:8-9.  Plaintiff's Complaint and testimony are corroborated by Officer Harder's police report.  In his report, Officer Harder stated that he "[r]esponded to a complaint of a woman standing in front of a NYSEG truck and refusing to let it leave."  Upon his arrival, he observed Plaintiff "lying on the hood of the NYSEG truck with the worker inside."  Dkt. No. 30, Ex. B. at 1.[2]

The risks associated with clinging to the hood of a running vehicle while the driver is seated behind the wheel indicate a probability of dangerous behavior and are sufficient to

---

[2]Although Plaintiff argues the Police Reports submitted by the officers are not admissible evidence, it is well established that entries in a police report resulting from the officer's own observations and knowledge may be admitted as evidence because police reports fall under the public records exception to the hearsay rule. See Fed. R. Evid. 803(8); Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir.1991); Williams v. City of New York, 2012 WL 511533, at *3 (E.D.N.Y. Feb. 15, 2012).

cause a person of reasonable caution to believe Plaintiff was conducting herself in a manner likely to result in serious harm to herself.  This is particularly so when coupled with the purported reason that Plaintiff climbed on the hood of the running vehicle and the availability of other means to get warm (e.g. going inside the house where it may have been warmer that outside or to retrieve additional clothing).  Accordingly, the officers had probable cause to seize Plaintiff pursuant to MHL § 9.41 and her false arrest claim fails as a matter of law.

### b. **Whether Probable Cause to Arrest Plaintiff for Disorderly Conduct Existed**

Assuming, *arguendo*, there was no probable cause to seize Plaintiff under MHL § 9.41, there was probable cause to arrest her for disorderly conduct under New York Penal Law § 240.20.  Probable cause to arrest exists when: 1) the officers have knowledge or reasonably trustworthy information of the facts and circumstances; and 2) this information is sufficient to warrant a person of reasonable caution to believe the person to be arrested has committed or is committing a crime.  See Amore v. Novarro, 624 F.3d 522, 536 (2d Cir. 2010).  A claim for false arrest turns only on whether probable cause existed to arrest the individual; it is not relevant whether there was probable cause with respect to the actual charge invoked by the arresting officer at the time of the arrest.  See Jaegly, 439 F.3d at 156.

Under New York Penal Law 240.20, a person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: 4) obstructs vehicular or pedestrian traffic or... 7) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.  See N.Y. Penal Law 240.20.  At the time Officer Harder arrived, Plaintiff was physically blocking the NYSEG vehicle from leaving the parking space on Lathrop Avenue by laying on the hood of the

running NYSEG vehicle.  Dkt. No. 30 Ex. A 53, 59-61.  As such, Officer Harder's observation at the scene was sufficient to warrant a person of reasonable caution to believe that Plaintiff was obstructing vehicular traffic and creating a hazardous situation by an act that served no legitimate purpose.  Therefore, probable cause existed to arrest Plaintiff for disorderly conduct.

At the very least, Defendants acted with arguable probable cause, entitling them to qualified immunity.  See Walczyk v. Rio, 496 F.3d 139, 163 (2d Cir. 2007).  Arguable probable cause exists if: 1) it was objectively reasonable for the officer to believe probable cause existed, or 2) officers of reasonable competence could disagree on whether the probable cause test was met.  See Amore, 624 F.3d at 536.  To determine whether an officer had arguable probable cause, courts examine the objective information the officer possessed at the time of the arrest, not his "subjective intent, motives, or beliefs."  Id.

Based on the fact that Officer Harder responded to a complaint that Plaintiff would not let the NYSEG worker leave her home and, when he arrived at the scene, Plaintiff was on the hood of the NYSEG vehicle, it was objectively reasonable for the officers to believe probable cause existed to seize Plaintiff pursuant to MHL § 9.41 or arrest her for violating the disorderly conduct statute.  Dkt. No. 30, Ex. A 42:7-12; Ex. B at 1.  As a result, Defendant officers are entitled to qualified immunity.

For these reasons, Plaintiff's False Arrest claim fails as a matter of law.


### 2. Free Speech Retaliation Claim

Second, Defendants move to dismiss Plaintiff's free speech retaliation claim.  Dkt. No. 30 at 253; Dkt. No. 32 at 30.  Plaintiff asserts this claim against all Defendants.  Dkt No. 39 at ¶ 102.  She argues she engaged in constitutionally protected speech when she: 1) protested to Officer Harder that he was hurting her after he pulled her off the hood of the NYSEG truck and onto her front yard, and 2) asked Officer Harder what his name was.  Dkt. No. 30, Ex. A 77-78.  She alleges that only after this protest did Officer Harder express any intention to have Plaintiff brought to CPEP.  Dkt. No. 46 at 5.  As a result, she argues her seizure was motivated by retaliatory animus and made in an effort to prevent her from further exercising her right to protest and report police officer misconduct.  Dkt. No. 39 at ¶¶ 98-01; Dkt. No. 46 at 5.  Defendants seek to dismiss this claim on the ground that there was probable cause for her arrest.  Dkt. No. 30 at 253; Dkt. No. 32 at 30.

To establish a retaliation claim under § 1983, a plaintiff must show: 1) she has an interest protected by the First Amendment; 2) the defendants' actions were motivated or substantially caused by the exercise of that right; and 3) the defendants' actions effectively chilled the exercise of the plaintiff's First Amendment right.  See Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001); Blue v. Koren, 73 F.3d 1072, 1083 (2d Cir. 1995).  Probable cause will defeat a claim that an arrest or prosecution was based on a retaliatory motive.  See Pearson v. Lorancaitis, 2012 WL 162355, at * 15 (D. Conn. Jan. 19, 2012) (citing Hartman v. Moore, 547 U.S. 250, 265–66, 126 S. Ct. 1695, 1707 (2006)); see also Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992).

Because the Court finds Defendants had probable cause to arrest, Plaintiff cannot prove the second element of her retaliatory arrest claim.  Accordingly, her claim fails as a matter of law.  Even assuming probable cause did not exist, arguable probable cause existed,

thereby entitling Defendants to qualified immunity.  See Mozzochi, 959 F.2d at 1180 (qualified immunity shields an officer from a retaliation claim where a reasonable officer would believe that the arrest and prosecution at issue was supported by probable cause).

For the aforementioned reasons, the First Amendment retaliation claim is dismissed.

### 3.   **Illegal Search Claim**

Third, Defendants move to dismiss Plaintiff's illegal search claim.  Plaintiff asserts this claim against all Defendants.  Dkt. No. 30 at 254; Dkt. No. 32 at 31.  Plaintiff alleges the Defendant officers searched Plaintiff's person and purse when she arrived at the hospital without a search warrant, consent, exigent circumstances, or any other legal justification.  Dkt. No 39 at ¶ 75.  Defendants seek dismissal of this cause of action on the grounds that the pat down and the inventory search were conducted by the hospital staff; not Defendants.  Dkt. No. 30 at 254; Dkt. No. 32 at 31.

Plaintiff's Complaint and her deposition[3] testimony establish that neither the pat down nor the inventory search were conducted by Defendants.  In her Complaint, she alleges that the hospital staff apologized as they subjected her to a pat down and that a hospital officer searched her purse.  Dkt. No. 39 at ¶ 48.  In addition, Plaintiff stated at her deposition that she did not see Officer Mooney at the hospital and that he did not search Plaintiff's person or her purse.  Dkt. No. 30, Ex. A at 130:13-16.  With respect to Officer Harder, Plaintiff indicated that, although he was at the hospital, he did not pat her down or search her purse.

---

[3]Plaintiff now refutes her prior testimony that the search of her person and purse were not conducted by Binghamton police officers.  Dkt. No. 46 at ¶ 97.  "A party cannot survive summary judgment simply by contradicting his or her own previous sworn statement... without explaining the contradiction or attempting to resolve the disparity."  Cleveland v. Policy Management Systems Corp.,526 U.S. 795, 806 119 S. Ct. 1597, 1604 (1999).  Here, Plaintiff makes no explanation regarding her contradicting statements.  Therefore, the Court will not consider her statements.

Dkt. No. 30 Ex. A 124:11-13-130:13-16.  Her statements are further supported by Officer

Harder's responses to Plaintiff's interrogatories, where he stated he did not participate in the

decision to search Plaintiff's person or to conduct an inventory search of her property.  Dkt.

No. 49, Ex. E at ¶ 12.  These facts indicate Defendants did not conduct a search of Plaintiff's

person or purse.  As a result, Plaintiff cannot make out an illegal search claim against

Defendants.

Even assuming a named Defendant conducted a pat down on Plaintiff and searched

her purse, neither search is actionable.  If there is probable cause to arrest, a warrant is not

needed to search the individual's person incident to the arrest or to conduct an inventory

search of property seized along with the person.  See United States v. Perea, 986 F.2d 633,

643(2d Cir. 1993); see also Virginia v. Moore, 553 U.S. 164, 177, 128 S. Ct. 1598, 1607

(2008).  Therefore, even assuming Defendant officers searched Plaintiff's person and

conducted an inventory search of her purse, her claim fails as a matter of law because these

searches were made incident to a seizure based on probable cause.

### 4.   Illegal Warrantless Invasion of Private Residence Claim

Fourth, Defendants move to dismiss Plaintiff's illegal warrantless invasion of private

residence claim.  Plaintiff asserts this claim against all Defendants.  Plaintiff argues that

Defendants Harder and Mooney violated her Fourth Amendment rights when they entered her

private residence without a warrant, consent, or exigent circumstances.  Dkt. No. 39 at ¶ 78.

She alleges that after being told she was going to be taken into custody, she asked if she

could tend to her dog, brush her hair and teeth, take her medicine, use the bathroom, and

lock up her house before she leaves.  Id. at ¶ 23.  The officers allowed her to do so.  Id. at ¶

29.  After letting her dog out, Plaintiff alleges that she entered the house with her dog at her

side, and the officers pushed in right behind her.  Id.; Dkt. No. 30, Ex. A 103:7-8.  At all times in the house, the officers remained only where Plaintiff was physically present.  Dkt. No. 30, Ex. A 103:1-3.

Defendants seeks dismissal of this claim on the grounds that the officers were entitled to enter her home to maintain custody over her after the seizure, and Plaintiff implicitly consented to being escorted into her home when she asked permission to enter inside her home.  Dkt. No. 30 at 256; Dkt. No. 32 at 33.  Plaintiff has not offered argument in opposition to Defendants' motion on the illegal entry claim.  "[T]he failure to oppose a portion of a motion for summary judgment is deemed abandonment of the claim to which the motion applies, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." Mitchell v. City of Albany, 2010 WL 1235389, at *7 (N.D.N.Y. Mar.31, 2010); N.D.N.Y.L.R. 7.1(b)(3).  As such, the motion for summary judgment is granted on this claim.

Even had Plaintiff opposed the motion, the Court finds the officers' entry into Plaintiff's home was not unlawful.  A warrantless entry into a private home violates the fourth amendment unless consent or exigent circumstances are present.  United States v. Karo, 468 U.S. 705, 714–15, 104 S. Ct. 3296, 3302–03, 82 L. Ed. 2d 530 (1984).  However, following a lawful arrest, it is not unreasonable under the Fourth Amendment for a police officer to monitor the movements of an arrested person due to the obvious possibility that an arrested person will attempt to escape or pose a threat if not properly supervised.  Washington v. Chrisman, 455 U.S. 1, 6, 102 S. Ct. 812 (1982).  Because of an officer's need to ensure his own safety and maintain the integrity of the arrest, an officer may accompany an arrestee into her residence and keep a watchful eye on her.  See id.; United States v. Di Stefano, 555 F.2d 1094, 1101 (2d Cir.1977); United States v. Rudaj, 390 F. Supp. 2d 395, 401 (S.D.N.Y. 2005)

(not unlawful to accompany arrestee into her home after giving her permission to change her clothes).  Such surveillance is not an impermissible invasion of the privacy or personal liberty of an arrested individual.  See Chrisman, 455 U.S. at 6, 102 S. Ct. at 812.

Here, the officers' entry into Plaintiff's home was justified.  Plaintiff had been lawfully seized based on probable cause and was in Defendants' custody before the officers accompanied Plaintiff inside her residence based upon her request to reenter the home.  Cf. Virginia, 553 U.S. at 177, 128 S. Ct. at 1607 (a lawful arrest is an arrest based on probable cause).  Indeed, the facts undisputedly show that Officer Harder told Plaintiff she would be taken to CPEP before the officers entered into Plaintiff's home.  Dkt. No. 30, Ex. A 68:5-6; 78:2-3.  Because it was not unreasonable for Defendants to follow Plaintiff into her home, Plaintiff's claim fails as a matter of law.

### 5.  Excessive Force Claim

Fifth, Defendants move to dismiss Plaintiff's excessive force claim.  Plaintiff brings this claim against Defendants Harder, Mooney, Chapman, and Zikuski.  Dkt. No. 39 at ¶ 72.  Plaintiff alleges Officer Harder employed excessive force causing bruises to her arm when he grabbed her by the back of her pants and her arm, pulled her off the NYSEG vehicle, and dragged her across her front yard.  Dkt. No. 39 at 14; Dkt. No. 30, Ex. A at 142: 3-12.  She testified that she thought he was going to push her into her front stoop, that he was "deliberately trying to keep [Plaintiff] off balance, and that he was "dragging and shaking [her] like a rag doll."  Id. at 59:6-7, 64:17-25-65:1.  She also alleges the officers employed excessive force when they handcuffed her in her bathroom and dragged her down the driveway to the front steps of her home.  Dkt. No. 39 at ¶ 41.  She claims she asked Officer Harder to loosen the handcuffs because they were too tight but he refused.  Id.  Plaintiff

testified that Harder put his two fingers between the cuffs and the underside of her wrists, yanked the handcuffs, and told her "they're fine."  Dkt. No. 30, Ex. A at 108:22-23.  Plaintiff alleges she suffered post traumatic severe arthritis in her wrists due to the application of handcuffs.  Dkt. No. 46 at 2.  Defendants move to dismiss the claim on the grounds that Plaintiff suffered no injury.

"All claims that law enforcement officers have used excessive force... in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment."  Burdick, 2009 WL 1707475, at *3.  In determining whether a police officer used excessive force, courts examine "whether the use of force was objectively reasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation."  Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1872 104 L.Ed.2d 443 (1989).  In making a reasonableness determination, courts consider: 1) the severity of the crime committed; 2) the threat of danger to the officer and society; and 3) whether the suspect was resisting or attempting to evade arrest.  McMahon v. Fura, 2011 WL 6739517, at *8 (N.D.N.Y. Dec. 23, 2011)(citing Thomas v. Roach, 165 F.3d 137, 143 (2d Cir.1999)).  If the force used was unreasonable and excessive, Plaintiff may recover even if the injuries inflicted were not permanent or severe.  Robinson v. Via, 821 F.3d 913, 924 (2d Cir. 1987).  Moreover, the reasonableness of the force used is typically a question for the jury, and courts have granted summary judgment on excessive force claims only when there has been no injury or only minor injuries.  Burdick, 2009 WL 1707475, at *4.

Additionally, in the context of an arrest, it is well established that a police officer has the right to use some degree of physical coercion.  Graham, 490 U.S. at 396.  However, handcuffing can give rise to an excessive force claim where a Plaintiff suffers injury as a

result.  Burdick, 2009 WL 1707475, at *4.  In evaluating the reasonableness of handcuffing, the Court considers: 1) evidence that the handcuffs were unreasonably tight; 2) whether the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists.  Esmont v. City of New York, 371 F. Supp. 2d 202, 215 (E.D.N.Y 2005); cf. Gonzales v. City of New York, 2000 WL 516682 (E.D.N.Y. March 7, 2000) (denying summary judgment where Plaintiff presented expert testimony that he suffered permanent injury from handcuffs and requested that the handcuffs be loosened).

Defendants seek dismissal of the excessive force claim on the grounds that Plaintiff suffered no physical injury when she was "yanked off the truck," dragged across her yard, or as a result of being handcuffed.  Dkt. No. 30 at 257; Dkt. No. 32 at 35.  Issues of fact remain whether Officer Harder employed excessive force when removing Plaintiff from the NYSEG vehicle and dragging her across her front yard.  Plaintiff alleges she suffered bruises as a result of this force.  Dkt. No. 39 at 14; Dkt. No. 30, Ex. A at 142: 3-12.  Given the fact that lying on the hood of a vehicle constitutes only a *de minimis* offense and that Plaintiff did not appear to pose a threat of danger to Officer Harder or society, issues of fact remain whether it was objectively reasonable for Officer Harder to grab Plaintiff, "yank" her off the NYSEG vehicle, and then drag her through her front yard.  Therefore, even though Plaintiff's alleged injuries were not permanent or severe, a reasonable fact finder could conclude that the force employed by Officer Harder was excessive and unreasonable under the circumstances.  Accordingly, summary judgment will not be granted on this claim.

With respect to Plaintiff's allegation that the officers' application of the handcuffs caused Plaintiff's arthritis in her wrist, Plaintiff testified that she did not experience pain in her wrists until November of 2010, nearly a year after being handcuffed.  Dkt. No. 30, Ex. A.

32:14-17.  Defendants support their claim that Plaintiff's arthritis was not due to the handcuffs

with the following evidence: 1) Plaintiff's bone scan, which reveals Plaintiff suffers arthritis in

her wrists, spine, shoulders, ankles, and feet; 2) the notes of her Orthopedic Surgeon who

performed this bone scan, which state: "the arthritis in these [her wrist] joints is not due to the

arrest in my judgment and although the arrest and the hand cuffs may have aggravated them,

it did not cause the arthritis;" and 3) the Emergency Medical Report, which indicates Plaintiff

was handcuffed for only about four minutes.  Id. at Ex A. 196:1-3; Ex. C; Ex. E at 3.

        In opposition to Defendants' motion, Plaintiff states that Defendants misrepresent

her medical records.  Dkt. No. 26 at 2.  She states that the medical records demonstrate that

she suffers from severe arthritis in her wrists without evidence of any similarly severe degree

of joint destruction elsewhere.  Id.  She also supports her argument with an affidavit of

Michael Rouhana, D.C., of Southern Tier Spine and Medical, who recently treated Plaintiff's

wrist arthritis with deep tissue laser treatment.  Dkt. No. 46, Ex. 5.  In his affidavit, Dr.

Rouhana states that: "[t]he severe degenerative changes present in [Plaintiff's] wrists are

consistent with traumatic joint injury sustained in the police altercation of September 2009

given that the patient history does not indicate other intervening wrist trauma and/or serious

occupational or recreational repetitive stress issues that would cause the present severe

degree of wrist joint degeneration."  Id.

        Dr. Rouhana was not disclosed by Plaintiff as either a treating physician and/or an

expert during the discovery deadlines.  Dkt. No. 46.  Plaintiff states he was not disclosed

because she did not start treating with him until after the discovery deadline.  Id.  Pursuant to

Fed. R. Civ. P. 26(e), she sent the records from Dr. Rouhana's Chiropractic Office along with

Dr. Rouhana's affidavit on June 18, 2012, after Defendants had moved for summary judgment.

The Affidavit of Dr. Rouhana presents an issue of fact concerning whether the injuries to Plaintiff's wrists were caused by the unreasonable application of handcuffs, thereby precluding summary judgment. Because the denial of the this portion of Defendants' motion is based on new evidence, the Court grants Defendants thirty days to obtain discovery concerning Dr. Rouhana, including deposing him. Defendants also may apply to the Magistrate Judge for leave to obtain an expert concerning whether the handcuffs caused injury to Plaintiff's wrists. Within twenty-one days after completion of any such additional discovery, Defendants may file a renewed motion for summary judgment, limited to whether the application of the handcuffs caused injury to Plaintiff's wrists.

### 6.   American with Disabilities Act Claim

Sixth, Defendants move the Court to dismiss Plaintiff's ADA claim. Plaintiff asserts this claim against Defendants Harder, Mooney, and Zikuski. Dkt. No. 39 at ¶¶ 6-8, 103-06. She alleges that she was discriminated against due to her disability and was deprived of her service dog. Dkt. No. 39 at ¶¶ 103-06. Plaintiff argues that Chief Zikuski failed to "ensure that his officers are adequately trained to accommodate, protect, and uphold the rights of disabled citizens." Dkt. No. 46 at ¶ 106.

### a. Defendant Officers

The individual officers move to dismiss this claim on the grounds that there is no individual liability under Title II of the ADA. Dkt. No. 30 at 260; Dkt. No. 32 at 38. Because the ADA targets public entities, individuals cannot be named as defendants in their individual

capacities.  See Andino v. Fischer, 698 F. Supp. 2d 362, 380 (S.D.N.Y. 2010).  To the extent Plaintiff asserts claims against the officers in their individual capacity, they must be dismissed.

### b. Defendant City

Although Plaintiff does not specifically plead an ADA claim against the City, she does reference her ADA Claim in her Monell claim against the City.  Dkt. No. 39 at ¶ 82.  Her Monell claim alleges: "The acts of Defendants' described in Counts I, II, III, IV, VII, VIII [the ADA Claim] were a result of the following unconstitutional municipal customs, practices, and policies."  Id.  Because Plaintiff is pro se, the Court has a duty to read her pleadings liberally and, therefore, the Court considers the ADA claim against the City.  Cf. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996) (Pro se pleadings must be read liberally and should be interpreted to raise the strongest arguments that they suggest).

The City argues that if Plaintiff has asserted an ADA claim against the City, it should be dismissed because Plaintiff fails to demonstrate that her dog meets the ADA's definition of a service dog and fails to show that she was discriminated against because of her disability.  Dkt. No. 30 at 262-63.  In response, Plaintiff submits the official brochure from the NYS Attorney General's Office, titled "Service Animals: Frequently Asked Questions," which she argues states that specific documentation or identification that the dog has been specially trained by a recognized or certified training program is not required for the owner and animal to be accorded the rights and accommodations under the applicable federal and state disability laws.  Dkt. No. 49 Ex. 4.[4]

---

[4] The Attorney General brochure states: "If an animal meets the ADA definition, animals are considered service animals under the ADA regardless of whether they have been licensed or certified by state or local government."  Dkt. No. 46 Ex. 4.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (1990).  To establish a violation under the ADA, Plaintiff must demonstrate: 1) that she is a "qualified individual" with a disability; 2) that Defendant is subject to the ADA; and 3) that she was "denied the opportunity to participate in or benefit from Defendant's services, programs or activities, or was otherwise discriminated against by Defendant by reason of her disability.  Powell v. Nat'l Bd. of Medical Examiners, 364 F.3d 79, 85 (2d Cir. 2004).

An arrest or seizure of an individual, including post arrest transportation and investigation, is a "service, activity, or benefit" of a police department and is thus covered under the ADA.  See Anthony, 2001 WL 741743, at *11.  To establish liability in the context of an arrest or seizure, Plaintiff must show: 1) that she was wrongfully arrested because the officers perceived her disability as criminal activity; or 2) the officers failed to provide a reasonable accommodation during the course of the investigation or arrest, causing her to suffer greater injury or indignity than other arrestees.  See Ryan v. Vermont State Police, 667 F. Supp. 2d 378, 387 (D. Vt. 2009); cf. Gorman v. Bartch, 152 F.3d 907, 913 (8th Cir. 1998) (paraplegic arrestee properly alleged ADA violation after suffering injuries while being transported to jail in a van not equipped for wheelchair transport).  A reasonable accommodation is one that gives the disabled individual meaningful access to the program or services sought.  See Henrietta v. Bloomberg, 331 F.3d 261, 282 (2d Cir. 2003).  Additionally, Plaintiff must show that she was denied a reasonable accommodation or was wrongfully arrested "by reason of her disability."  To satisfy this requirement, Plaintiff need only

demonstrate that her disability was a cause of the denial.  See Henrietta, 331 F.3d at 278; cf.

Andino v. Fischer, 698 F. Supp. 2d 362, 379 (S.D.N.Y. 2010) (A logical nexus between the

accommodation and the disability must be present).

Plaintiff satisfies the first two elements of an ADA claim.  She is a qualified individual

with a disability and the City is subject to the requirements of the ADA.  Under the ADA, a

disability is defined as: "a physical or mental impairment that substantially limits one or more

of the major life activities of such individual."  28 C.F.R. § 36.104 (2011).  A physical or mental

impairment is "any physiological disorder or condition, cosmetic disfigurement, or anatomical

loss affecting one or more of the following body systems: neurological; musculoskeletal;

special sense organs; respiratory, including speech organs; cardiovascular; reproductive;

digestive; genitourinary; hemic and lymphatic; skin; and endocrine."  Id.  A major life activity is

defined as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking,

breathing, learning, and working."  Id.  Here, Plaintiff suffers from a multiple sclerosis, an

autoimmune disease that affects the brain and spinal cord.  She requires help performing

daily tasks such as sitting and reaching.  Dkt. No. 46; Ex. 10.

Additionally, a public entity under the ADA is defined "any State or local government

[or] any department, agency, or other instrumentality of a State or States or local

government."  42 U.S.C. § 12131(1).  Hence, a police department is a public entity as

described under the ADA.  See Anthony v. City of New York, 2001 WL 741743, at

*11(S.D.N.Y. July 2, 2000), aff'd, 339 F.3d 129, 141 (2d Cir. 2003).

Although Plaintiff can satisfy the first two elements of her ADA claim, her claim fails as a

matter of law because there is insufficient evidence to establish the last element.  Plaintiff is

alleging a reasonable accommodation theory.  She alleges Officers Harder and Mooney failed

to provide a reasonable accommodation when they denied her request to be accompanied by her service animal to her hospital.  She alleges that the officers scoffed at her request, acting "annoyed and disgusted."  Dkt. No,. 46 at ¶ 76.  Defendants move to dismiss on the grounds that Plaintiff's dog does not qualify as service dog under the ADA and thus is not a reasonable accommodation.  Under the ADA, a service animal is defined as "any animal individually trained to do work or perform tasks for the benefit of an individual with a disability."  28 C.F.R § 36.104.  The work or tasks performed by a service animal must be directly related to the individual's disability.  Id.  Examples of tasks include retrieving items such as medicine, or the telephone, and providing physical support and assistance with balance and stability.  Id. Plaintiff's dog meets this definition because she personally trained her dog to help her pick up things off the floor, assist her when she gets out of chairs, and provide support when she leans on him when she feels unbalanced.  Dkt. No. 30, Ex A 90-93.

    Although Plaintiff's dog qualifies as a service dog under the ADA, her allegation that she was deprived of a reasonable accommodation when the officers refused to let her dog accompany her to the hospital fails for two reasons.  First, there is insufficient evidence indicating that she was not "reasonably accommodated" during her transport to the hospital. The City had an obligation under the ADA to accommodate Plaintiff's disabilities by transporting her in a safe and appropriate manner.  See Ryan, 667 F. Supp. 2d at 389.  Here, there is no indication it did not.  Plaintiff, who was transported to the hospital in an ambulance, has not demonstrated that the accommodations provided to her during her transport deprived her of "meaningful access to the services sought."  Second, Plaintiff has set forth insufficient evidence indicating that her failure to be "reasonably accommodated," *i.e.* deprived of the

accompaniment of her service dog, caused her to suffer any harmful consequences.  For these reasons, her ADA claim fails and is, therefore, dismissed.

### 7.  **Monell Claim**

Seventh, Defendant City of Binghamton moves to dismiss Plaintiff's <u>Monell</u> claim against it.  Dkt No. 30 at 260.  Plaintiff alleges that the City of Binghamton has the following unconstitutional customs, practices, and policies: 1) failure to train and supervise police officers regarding the use of force and arrest procedures; and  2) failure to adequately investigate allegations of police misconduct and discipline officers.  Dkt. No. 39 at ¶¶ 82-83.  She argues that, as a result of these policies, customs, and practices, she was deprived of her Fourth Amendment Rights.  <u>Id.</u> at ¶ 84.  The City moves to dismiss this claim on the grounds that there has been no underlying constitutional violation.  Dkt. No. 30 at 260.  In response to the City's motion, Plaintiff supports her <u>Monell </u>claim by attaching the Official Internal Affairs Policy of the Binghamton Police Department.  Dkt. No. 46, Ex. 2.

To set forth a cognizable <u>Monell</u> claim against a municipality, Plaintiff is required to plead and prove: 1) that an official policy or custom, 2) caused the plaintiff to be subjected to 3) a denial of a constitutional right.  <u>Smith v. City of Syracuse</u>, 2012 WL 280735, at *10 (N.D.N.Y. Jan. 31, 2012).  Conclusory allegations of municipal custom or policy are insufficient to satisfy this requirement.  <u>See</u> <u>Devarnne v. City of Schenectay</u>, 2011 WL 219722, at * 3 (N.D.N.Y. Jan. 21, 2011).  The "mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference."  <u>See</u> <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 536 (2d Cir.1993) (quoting <u>Dwares v. City of New York</u>, 985 F.2d 94, 100 (2d Cir.1993)).

In opposition to Defendant's motion, Plaintiff submitted the G.O. 627, "Internal Affairs Unit Policy and Procedures."  Dkt. No 46, Ex. 2.  This document states that the findings of any charges or complaints must be concluded as one of the following: 1) unfounded–the alleged act did not occur; 2) exonerated–officer's conduct was lawful, justified, and proper; 3) sustained–conduct alleged occurred beyond a reasonable doubt and amounts to misconduct; or 4) not sustained–insufficient evidence exists to clearly prove or disprove the allegation.  Id. Plaintiff argues that requiring proof beyond a reasonable doubt to sustain a misconduct complaint at the Internal Affairs department level "thwarts officer accountability, interferes with appropriate disciplinary actions and leads officers to believe that they can avoid any consequences for unlawful conduct by merely raising any doubt."  Dkt. No. 46 at 6.  She argues that this policy enhances the likelihood officers will disregard constitutional restraints on their conduct.  Id.  She states that of the dozens of internal complaint files she reviewed, some containing extraordinarily serious allegations, she did not review any that sustained a misconduct filing.[5]  She argues that the high burden of proof is likely responsible.

Plaintiff's conclusions regarding the link between the police officer misconduct and the Internal Affairs policy are speculative and she fails to support them with any evidence.  As a result, she cannot establish a causal connection between this policy and the denial of any constitutional right.  Therefore, her Monell claim fails as a matter of law.

### 8.  **Supervisory Liability Claim**

Eighth, Defendants Chief Zikuski and Captain Chapman move to dismiss Plaintiff's supervisory liability claim.  Plaintiff alleges that Chief Zikuski had knowledge of prior citizen

---

[5] Plaintiff did not attached these files to her motion, she attached only one Internal Affairs investigation report.  Dkt. No. 49, Ex. 11.

mistreatment complaints concerning the Defendant officers and other officers and that, by failing to train, supervise, or discipline his subordinates, he created an unreasonable risk of misconduct and harm toward the citizenry.  Id. at ¶¶ 88-91.  Additionally, she alleges that Captain Chapman fails to keep adequate records of complaints, fails to provide a written report of findings to complainants, and deliberately avoids eyewitness contact and interviews. Id. at ¶ 95.  She argues his pattern of lackadaisical investigation has promoted an acceptance of constitutionally offensive police conduct that is affirmatively linked to the violations suffered by Plaintiff.  Id. at ¶ 96.  Defendants move to dismiss this claim on the grounds that there has been no underlying constitutional violation.  Dkt. No. 30 at 260.

Plaintiff has not offered argument in opposition to Defendants' motion on the supervisory liability claim.  "[T]he failure to oppose a portion of a motion for summary judgment is deemed abandonment of the claim to which the motion applies, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." Mitchell, 2010 WL 1235389, at *7; N.D.N.Y.L.R. 7.1(b)(3).  Accordingly, the motion for summary judgment is granted on this claim.

Even if Plaintiff had opposed the motion, she cannot establish a supervisory liability as a matter of law.  To impose liability on a defendant acting in his supervisory capacity, Plaintiff must show evidence of the supervised official's personal involvement in the alleged constitutional violation.  See Hayut v. State University of New York, 352 F.3d 733, 753 (2d Cir. 2003).  "Personal involvement" is not limited to direct participation by the supervisor; it may be established by evidence of the supervisor's: 1) failure to remedy a wrong after being informed through a report or appeal; 2) grossly negligent supervision of subordinates who committed a violation; 3) failure to act on information indicating that unconstitutional acts were occurring; or

4) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue.  See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003).  The plaintiff must demonstrate a causal link between the supervisor's inaction and her constitutional injury.  See Jones v. City of Hartford, 285 F. Supp. 2d 174, 187 (D. Conn. 2003) (citing Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002)).

Plaintiff cannot establish a supervisory liability claim against Chief Zikuski and Captain Chapman because there is insufficient evidence demonstrating that either officer was personally involved.  She cannot establish that Chief Zukiski and Captain Chapman failed to act on information indicating that unconstitutional acts were occurring or failed to remedy a wrong after being informed through a report or appeal because neither of the arresting officers had previously engaged in unconstitutional conduct.  Dkt. No. 47, Ex. 6 ¶¶ 1,4-6; Ex. 7 ¶ 17. Similarly, besides her conclusory allegations set forth in her Complaint, Plaintiff has set forth no evidence that Chief Zikuski or Captain Chapman were grossly negligent when supervising Officer Harder or Officer Mooney, or that either official allowed a policy[6] or custom that sanctioned constitutionally offensive conduct to continue.  Cf. Cicio v. Graham, 2009 WL 537534 at *7 (N.D.N.Y. Mar. 3, 2009) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability.").  Accordingly, Plaintiff's supervisory liability claims are dismissed.

---

[6]Given Plaintiff's pro se status, the Court applies Plaintiff's Monell argument that the Internal Affairs policy increases the likelihood of constitutional infringements to her supervisory liability claim.  However, this policy argument fails to establish supervisory liability as a matter of law because Plaintiff does not present evidence establishing a causal link between the depravation of her constitutional right and the Internal Affairs Policy.

**b.** **State Law Claims**

Of Plaintiff's nine state claims[7], Defendants seek to dismiss the following: 1) intentional infliction of emotional distress ("IIED"); 2) battery; 3) abuse of process; 4) defamation; 5) violation of New York Civil Rights Law Art. 2 § 8; 6) violation of New York Civil Rights Law Art. 4b § 47(b) and NY Executive Law Art. 15 § 296(14); and 7) trespass.[8,9]

### 1.    Intentional Infliction of Emotional Distress

Defendants move to dismiss Plaintiff's IIED claim.  Dkt. No. 30 at 268; Dkt. No. 32 at 39.  Plaintiff sets forth this claim against Officers Mooney and Harder, Chief Zikuski, and Captain Chapman, alleging Officers Harder and Mooney intended to cause Plaintiff severe emotional distress by: 1) using the term "behavioral" to describe why Plaintiff was going to the hospital; 2) bringing her out to her front yard after she was arrested and exposing her to her neighbors; and 3) sending her to CPEP.  Dkt. No. 39 at ¶ 110.

---

[7] Plaintiff states for the first time in her opposition to Defendants' motion for summary judgment that she asserts a false imprisonment claim under state law.  Because she did not assert this cause of action in her Amended Complaint, the Court will not consider it now.  Even had she asserted this claim under state law, Plaintiff's claim must fail because, as previously noted, Defendants acted with probable cause.  See Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).

[8] Defendants set forth no arguments regarding Plaintiff's New York Constitutional claims nor her respondeat superior claim.  Plaintiff's New York Constitutional claims of free speech, right to be free from unreasonable searches and seizures, and right to be free from discrimination are subject to the same standards as her Federal Constitutional claims. Hafez v. City of Schenectady, 2012 WL 1368157, at *21 n. 12 (N.D.N.Y. Apr. 19, 2012) (unreasonable searches and seizures are subject to the same standards under state and federal law); Jadama v. Keycorp, 2011 WL 2432931, at *2 n. 3 (N.D.N.Y. June 14, 2011) (discrimination claims are subject to same standard under state and federal law); Housing Works, Inc. v. Turner, 179 F.Supp.2d 177, 199 (S.D.N.Y. 2001)(free speech is subject to the same standards under state and federal law).  Therefore, the Court dismisses the free speech and discrimination state claims for the reasons previously stated.  Similarly, the Court declines to grant summary judgment on the excessive force state claim for the reasons previously stated.

[9] It appears the one year statute of limitations has passed on Plaintiff's intentional torts claims of IIED, battery, defamation, and abuse of process.  Defendants have not addressed this issue, and the Court will not raise it sua sponte.  N.Y. C.P.L.R. § 215 (3) (2006); Dawkins v. Williams, 413 F. Supp. 2d 161, 177 (N.D.N.Y. 2006)(C.P.L.R. § 215(3) applies to IIED claim). Cuillo v. Shupnick, 815 F.Supp. 133, 136 (S.D.N.Y. 1993) (C.P.L.R. § 215 (3) applies to abuse of process claim).

Defendants move to dismiss this claim on the grounds that because Plaintiff readily admits she has not been treated for emotional injury, she cannot prove emotional distress. Dkt. No. 30 at 268; Dkt. No. 32 at 39.  Plaintiff responds by arguing that treatment for emotional distress is not a necessary material element of a damage claim for emotional distress.  Dkt. No. 46 at ¶ 108.  She also supports her argument with an affidavit of her husband, who states that the police officers' actions have caused his wife to demonstrate a "growing fear of repercussions from the police if she were to need to call them again in an emergency" and that "the mental anguish and distress continues today causing her to feel helpless knowing she cannot rely on the police for assistance."  Dkt. No. 49, Ex 1.

To succeed on an IIED claim, Plaintiff must plead and prove four elements: 1) extreme and outrageous conduct; 2) the intentional or reckless nature of such conduct; 3) a causal relationship between the conduct and the resulting injury; and 4) severe emotional distress.  See Steptoe v. City of Syracuse, 2011 WL 6012941, at *12 (N.D.N.Y. Nov. 01, 2011).  A plaintiff asserting an IIED claim bears a heavy burden.  Id.  Liability can be imposed only where the alleged conduct is outrageous in character and so extreme in degree, that it goes beyond all possible bounds of decency, and is regarded as atrocious and utterly intolerable in a civilized community.  Id.

Plaintiff has not met her high burden of establishing that the officers' conduct during this incident was so extreme and outrageous that it was beyond the bounds of human decency.  Additionally, it cannot be said that the "mental anguish and distress" Plaintiff allegedly suffers from "knowing she cannot rely on the police for assistance" rises to the level of severe emotional injury.  As a result, her IIED claim fails as a matter of law.

2.   **Battery**

Defendants also move to dismiss Plaintiff's battery claim.  Dkt. No. 30 at 269, Dkt. No. 32 at 41.  Plaintiff asserts this claim Defendants Harder and Mooney, alleging that they battered her by grabbing her clothing, twisting her arms, violently and painfully handcuffing her, and yanking her by her arms and clothing.  Dkt. No. 39 at ¶¶ 113-14.  Defendants move to dismiss on the grounds that Defendants' force was not unreasonable, and even if the force was unreasonable, the officers are immune pursuant to § 9.59 of the Mental Hygiene Law.

Battery claims under New York law are analogous to excessive force claims under the Fourth Amendment.  See Minasi v. City of Utica, 2011 WL 6842988, at *8 (N.D.N.Y. Dec. 29, 2011).  Courts evaluate such claims pursuant to the same standards.  Id.  Therefore, for the same reasons set forth in the excessive force section above, the Court declines to grant summary judgment on this claim.  The Court grants Defendants leave to reopen discovery and refile a motion for summary judgment on this claim insofar as it related to handcuffing in accordance with the timing set forth above.

3.   **Abuse of Process**

Defendants next move to dismiss Plaintiff's abuse of process claim. Dkt. No. 30 at 269, Dkt. No. 32 at 41.  Plaintiff alleges that Officers Harder and Mooney abused the process and authority provided to them under MHL § 9.41.  Dkt. No. 39 at ¶ 116.  Defendants move to dismiss on the grounds that Plaintiff has failed to identify any regularly issued process and has failed to demonstrate "how the officers perverted § 9.41 for a collateral objective."  Dkt. No. 30 at 269, Dkt. No. 32 at 41.  Plaintiff responds by arguing that Defendants have not presented admissible evidence that would justify the massive curtailment of liberty imposed under § 9.41.  Dkt. No. 46 at 6.

An abuse of process claim has three elements: 1) regularly issued process, either civil or criminal, 2) an intent to do harm without excuse or justification, and 3) use of the process in a perverted manner to obtain a collateral objective.  See Curiano v. Suozzi, 63 N.Y.2d 113, 116, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984).  Process has been defined as "a direction or demand that one person perform or refrain from doing some prescribed act." Williams v. Williams, 23 N.Y.2d 592, 596, 298 N.Y.S.2d 473, 246 N.E.2d 333 (1969).  The abused process must involve "an unlawful interference with one's person or property."  Id. Such "interference" may be an arrest, an attachment, or a provisional remedy of similar nature.  Id.  In addition, the pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim.  Lopez v. City of New York, 901 F. Supp. 684, 691 (S.D.N.Y. 1995) (citing PSI Metals v. Firemen's Ins. Co., 839 F.2d 42, 43 (2d Cir.1988)).  In New York, wrongful collateral objectives include economic harm, extortion, blackmail, and retribution.  See Ketchuk v. Boyer, 2011 WL 5080404, at *8 (N.D.N.Y. Oct. 25, 2011).

Here, Plaintiff's abuse of process claim fails as the facts are devoid of any allegations concerning any "collateral objective" that Defendants may have had after seizing Plaintiff.  Accordingly, this claim is dismissed.

### 4.   **Defamation**

Defendants also move to dismiss Plaintiff's defamation claim.  Plaintiff asserts this claim against Officers Harder and Mooney.  Dkt. No. 39 at ¶ ¶ 121-22.  First, Plaintiff argues Officer Harder engaged in slander per se when he announced "she's going to behavioral" in her neighborhood for all her neighbors to hear and again in a public area of the hospital.  Id. Second, she argues that Officer Harder's written statement, required by MHL § 9.41, which

"indicated Plaintiff was a danger to herself and others, appeared to be mentally ill, and required immediate psychiatric evaluation" constitutes libel per se. Id. at 124. Lastly, she argues that Officer Mooney and Officer Harder committed libel when they knowingly and maliciously created written police reports that are false, misleading, and impugn Plaintiff's reputation. Id. at 125. Defendants move to dismiss the claim on the grounds that the officers are entitled to qualified privilege. Dkt. No. 30 at 269-70; Dkt. No. 32 at 41.

To survive summary judgment for a defamation claim, Plaintiff must present sufficient evidence for a jury to conclude: 1) Defendant made a false statement; 2) the statement was "of or concerning" the plaintiff; 3) the statement was published without privilege or authorization to a third party; and 4) the statement caused the plaintiff harm or constituted defamation per se. See Lore v. City of Syracuse, 583 F. Supp. 2d 345, 383 (N.D.N.Y. 2008).

A qualified privilege is a defense to a claim of defamation. See Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 62 (2d Cir. 1993). A qualified privilege attaches to communications when the communications are: 1) made by an individual who has an interest in the subject, or a moral or societal duty to speak; and 2) sent to a person who has a corresponding interest or duty. See id. Once Defendant has proved that he is entitled to a qualified privilege, there arises a rebuttable presumption of good faith that may constitute a complete defense to the defamation action. See id.

To overcome a qualified privilege defense, the plaintiff must demonstrate: 1) that Defendant's statement was false; and 2) that Defendant abused the privilege. See Boyd v. Nationwide Mutual Insurance, 208 F.3d 406, 409-10 (2d Cir. 2000). To establish abuse of privilege, the plaintiff must show the defendant acted beyond the scope of the privilege, with

common law malice, or with knowledge that the statement was false or with a reckless
disregard as to its truth.  Id.

Regarding Officer Harder's use of the term "behaviorial," and his written statement
made pursuant to the MHL, these allegedly defamatory statements were made when he was
communicating with medical personnel.  Officer Harder and the medical personnel had a
common interest; that is, they had a moral and societal duty to accurately communicate
Plaintiff's medical and legal status.  As a result, Officer Harder is entitled to qualified privilege.

Plaintiff cannot overcome the qualified privilege defense for her slander or libel claim
against Officer Harder.  Regarding her slander claim, the use of the word "behaviorial" is not a
false statement; it was true that Plaintiff was being sent to the Behavioral CPEP Unit at
General Hospital.  With respect to her libel claim, Officer Harder's written statement was
required under MHL § 9.41.  Therefore, Plaintiff cannot prove he acted beyond the scope of
his privilege.  In addition, the record is devoid of evidence indicating that the statements in this
report were based on malice, reckless disregard for the truth, or knowledge that what he was
writing was false.  Hence, her defamation claim against Officer Harder fails as a matter of law.

Additionally, Plaintiff's libel claim against Officers Mooney and Harder regarding the
statements made in their police reports also fails as a matter of law.  Defendant officers are
entitled to a qualified privilege defense because they had a duty to write these police reports
and accurately communicate their view of the incident.  Plaintiff cannot overcome the qualified
privilege defense here because she has not established that the officers abused the privilege;
that is, she has not shown that the officers acted beyond the scope of the privilege, acted with
common law malice, reckless disregard for truth, or with knowledge that what they were

writing was false.  For these reasons, Plaintiff's defamation claim fails as a matter of law and is therefore dismissed.

### 5.  NY Civil Rights Law Art. 2 § 8

Defendants next move to dismiss Plaintiff's New York Civil Rights Law Art. 2 § 8 claim.  Dkt. No. 30 at 270; Dkt. No. 32 at 41.  Plaintiff alleges Defendants Harder, Mooney, Chapman, and Zikuski, violated her right, pursuant to NY Civil Rights Law Art 2 § 8, to be free from unreasonable searches and seizures.  This law adopts the language appearing in the United States Constitution.  N.Y. Civ. Rights Law Art. 2 § 8 ("This provision appears in the United States Constitution (4th Amendment)").  The identical language supports a policy of uniformity in federal and state courts.  See Hafez, 2012 WL 1368157, at *21 n. 12.  Thus, because the Court declines to grant summary judgment on Plaintiff's Fourth Amendment excessive force claim, it declines to grant summary judgment under New York Civil Rights Law Art. 2 § 8 as well.  As to all other claims of unreasonable search and seizure, however, those claims are dismissed in accordance with the reasoning set forth above.  The Court grants Defendants leave to reopen discovery and refile a motion for summary judgment on this claim with respect to the handcuffing incident, in accordance with the timing set forth above.

### 6.  NY Civil Rights Law Art. 4-B § 47-B and NY Exec. Law Art. 15 § 296(14)

Defendants also seek dismissal of Plaintiff's claim under New York Civil Rights Law Art. 4-B § 47-B claim and her New York Exec. Law Art. 15 § 296(14) against Officers Harder, Mooney, Chapman, and Zikuski.  Plaintiff argues that the officers violated her right to have a service dog in her custody and she was discriminated against due to her disability.  Dkt. No. 39 at ¶ 128.  Defendants move to dismiss this claim on the grounds that Plaintiff's dog does

not constitute a service dog within the meaning of either statute.  Dkt. No. 30 at 270; Dkt. No. 32 at 42.  In response, Plaintiff makes the same argument she set forth in her ADA claim above.

New York Civil Rights Law Art. 4-B § 47-B states:"Persons with a disability accompanied by...service dogs shall be guaranteed the right to have such dogs in their immediate custody while exercising any of the rights and privileges set forth in this article." N.Y. Civ. Rights Law Art. 4b § 47(b).  The rights and privileges referred to are the right to obtain and maintain employment, and the right to equal use and enjoyment of any public facility.  Id. at §§ 47- 47(a).  The New York courts have excluded from the definition of public facility those areas where the general public are customarily not invited or permitted.  Cf. Albert v. Solimon, 252 A.D.2d 139,146  684 N.Y.S.2d 375, 380 (1998) (Examination room of a doctors office was not a "public facility," and the physician did not discriminate when he ordered that the service dog leave the examination room); Perino v. St. Vincent's Medic. Ctr. of Staten Island,132 Misc. 2d 20, 23 502 N.Y.S.2d 921, 923 (N.Y. Sup. Ct. 1986) (Delivery room and labor room of a hospital were not "public facilities," and the presence of the father's service dog would present an unacceptable danger to expecting mother, the physicians, and nurses).

Here, Plaintiff's discrimination claim arises in the public facility context.  However, Plaintiff did not have a right to have her dog in her immediate custody.  At the time the officers refused Plaintiff's request to have her dog accompany her, Plaintiff had already been seized pursuant to MHL § 9.41.  She was about to be transferred in an emergency vehicle[10] to a

---

[10] The Court uses the term "emergency vehicle" here because, at the time the officers refused Plaintiff's request to be accompanied by her dog, it was not clear that Plaintiff would be transported in an

(continued...)

hospital room for psychiatric evaluation.  Neither an emergency vehicle nor a hospital room are public places; they are not areas where the general public are customarily invited or permitted.  Cf. Perino, 132 Misc. 2d at 23, 502 N.Y.S.2d at 923.  As such, Plaintiff did not have the right to have her service dog in her immediate custody and her Civil Rights Law claim fails as a matter of law.

With respect to the New York Human Rights Law, N.Y. Exec. Law § 296(14), Plaintiff's claim also fails.  This law states: "it shall be an unlawful discriminatory practice for any person engaged in an activity covered by this section to discriminate against... a person with a disability on the basis of his or her use of a service dog."  N.Y. Exec. Law. § 296(14) (2010).  This statute defines service dog more narrowly than it is defined under the federal ADA statute.  It defines service dog as "any dog that is trained to work or perform specific tasks for the benefit of a person with a disability by a recognized service dog training center or professional service dog trainer...".  Id. at § 292 (33).  Because Plaintiff has admitted her dog has not been professionally trained, this claim is dismissed.  Dkt. No. 30 Ex. A 92:14-16.

### 7. **Trespass**

Lastly, Plaintiff alleges Officers Harder and Mooney illegally intruded upon her private property on September 29, 2009.  Dkt. No. 39 at ¶ 134.  She further alleges that Captain Chapman, a few days post September 29, 2009, trespassed upon her property.  Id. at ¶ 134.  She argues that, but for her security detector, Defendant Chapman's trespass

---

[10](...continued)
ambulance.  The ambulance was called after the officers denied Plaintiff's request for accompaniment, and the call was due to Plaintiff's heart condition.  However, because Plaintiff had already been handcuffed, she would have likely been transported via another emergency vehicle, e.g. a police car.

would have gone undetected.  Id. at ¶ 136.  Defendants move to dismiss the claim on the grounds that the officers' entry onto her property was justified.  Dkt. No. 30 at 271.

Plaintiff has not offered argument in opposition to Defendants' motion on the trespass claim.  "[T]he failure to oppose a portion of a motion for summary judgment is deemed abandonment of the claim to which the motion applies, and, in the Northern District of New York, is deemed consent to granting that portion of the motion."  Mitchell, 2010 WL 1235389, at *7; N.D.N.Y.L.R. 7.1(b)(3).  As such, the motion for summary judgment is granted on this claim.

Even had Plaintiff opposed the claim, she cannot establish trespass as a matter of law.  Trespass is an intentional entry onto the land of another without justification or permission.  Woodhull v. Town of Riverhead, 46 A.D.3d 802, 804, 849 N.Y.S.2d 79, 81 (2d Dept. 2011).  For the same reasons set forth concerning the illegal entry claim previously discussed, Officer Mooney and Officer Harder lawfully entered onto Plaintiff's property.

With respect to Captain Chapman, he also was justified in entering onto Plaintiff's property.  If a law officer enters onto Plaintiff's property to carry out his official duties, his entry is justified and a trespass claim will not succeed.  See Mubarez v. State,115 Misc. 2d 57, 60 453 N.Y.S.2d 549, 552 (N.Y. Ct. Cl. 1982).  Here, Captain Chapman entered onto Plaintiff's property in the performance of his official duty.  He went to Plaintiff's home in response to her complaint to the Binghamton Police Department regarding the alleged misconduct of Officers Mooney and Harder.  Dkt. No. 39 at ¶ 55.  Therefore, he was justified in entering onto Plaintiff's property.  Accordingly, Plaintiff's trespass claim is dismissed.

**IV.  CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment [Dkt. Nos. 30, 32] is **GRANTED** with respect to the following federal and state claims: 1) false arrest; 2) freedom of speech; 3) illegal search of person and residence; 4) warrantless invasion of private residence; 5) <u>Monell</u> claim against the City of Binghamton; 6) Title II claim under the ADA; 7) IIED; 8) abuse of process; 9) defamation; 10) New York Civil Rights Law Art. 4-B § 47-B; 11) New York Exec. Law Art. 15 § 296(14); and 12) trespass.  Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiff's excessive force, battery, and violation of New York Civil Rights Law Art. 2 § 8 claims.  The Court **GRANTS** Defendants leave to reopen discovery and refile a motion for summary judgment on these claims insofar as they are related to the handcuffing incident, in accordance with the timing set forth herein. IT IS SO ORDERED.

Dated: August 7, 2012

Thomas J. McAvoy
Senior, U.S. District Judge